## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL A. WALLACE,       :
     Plaintiff,          :
                       :    **NO. 3:12-cv-1064**
     v.                 :
                       :    (JUDGE NEALON)
CAROLYN W. COLVIN,[1]    :
Acting Commissioner       :
of Social Security,         :
     Defendant        :

**FILED**
**SCRANTON**

APR 3 0 2014

PER _____ DEPUTY CLERK

### MEMORANDUM

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael Wallace's claim for social security disability insurance benefits. For the reasons set forth below, the decision of the Commissioner will be affirmed.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." Wallace met the insured status requirements of the Social Security Act through March 31, 2011. (Tr. 11).

Wallace was born on November 16, 1962 and was forty-two (42) years old on the alleged disability onset date. (Tr. 16, 127). Therefore, he was considered a "younger individual" whose

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

age would not seriously affect his ability to adjust to other work.[2]  (Tr. 16); 20 C.F.R. §§ 404.1563(c), 416.963(c).  Wallace graduated high school and has past relevant work as a truck driver.[3]  (Tr. 16).

Wallace protectively filed an application for disability insurance benefits on February 4, 2009, alleging disability since October 23, 2005 due to pain in his neck, back, arms and legs, diabetes and headaches.  (Tr. 9, 127-28, 149).  After his request for benefits was denied at the initial level, he filed a request for a hearing before an administrative law judge ("ALJ").  (Tr. 71-73).  A hearing was held on July 12, 2010.  (Tr. 19-62).  The ALJ issued a decision on August 16, 2010 denying Wallace benefits.  (Tr. 6-17).  Wallace then requested review by the Appeals Council which, by Notice of Action dated April 13, 2012, denied review, making the decision of the ALJ final.  (Tr. 1-5, 18).

On June 6, 2012, Wallace filed a complaint in this Court seeking review of the Commissioner's denial of his application for Social Security disability benefits.  (Doc. 1).  The Commissioner filed an answer to the complaint and a copy of the administrative record on August 14, 2012.  (Docs. 5, 6).  Wallace filed the brief in support of his appeal on September 13, 2012, and the Commissioner filed her brief on October 9, 2012.  (Docs. 8, 9).  The matter is ripe for disposition and, for the reasons set forth below, the Commissioner's decision will be

---

[2] The Social Security Regulations define a younger person as follows: "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c), 416.963(c).

[3] At the ALJ hearing, the vocational expert testified that Wallace's work as a truck driver was semi-skilled work that required heavy exertion.  (Tr. 16, 55-58).

affirmed.

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a

3

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

4

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of

5

the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an individual is still able to do despite

the limitations caused by his or her impairment(s).").

### Medical Background

In 2004, Wallace fell off a truck and landed on his left shoulder and neck. Initially, he

did not have much pain, though he was achy and stiff at times. Around September 2004,

Wallace began experiencing significant neck pain, pain radiating down his left arm, and constant

numbness and tingling. Wallace went to the emergency room on September 29, 2004, with

complaints of left shoulder pain. (Tr. 259-60).

Wallace began treating with Stephen K. Powers, M.D., a neurosurgeon, in 2004. (Tr.

217-35). In November 2004, Wallace presented to Dr. Powers with complaints of pain in the left

side of his lower neck, upper shoulder and arm area and extending occasionally with pain over

the anterior lateral thigh on the left. (Tr. 231). Dr. Powers noted that Wallace has a "left C4

primarily painful sensory radiculopathy with some minor motor component." (Tr. 232). Dr.

Powers recommended surgery to open up the neural foramen and he recommended a CT scan.

(Tr. 232).

In November 2004, Wallace had a CT scan of the cervical spine which revealed severe

narrowing of the neural foramina on the left side at the C3-C4 level due to bony spurring and

osteophyte formation within the left facet joint. (Tr. 234). On November 22, 2004, Wallace

underwent cervical spine surgery for removal of a growth and decompression of the left C4 nerve

root. (Tr. 13, 234).

6

On December 8, 2004, Wallace reported to Dr. Powers that he continued to have pain in the left side of his lower neck, left shoulder and arm area and extending occasionally with pain over the anterior lateral thigh on the left. (Tr. 229). Dr. Powers noted that a CT scan revealed an osteomatous appearing growth off the undersurface of the left C4 pars superior down into the neural foramen. (Tr. 229). Dr. Powers recommended surgery to remove the growth. (Tr. 229-30). Dr. Powers reviewed the CT scan and recommended a left C4 microforaminotomy to remove the lesion. (Tr. 230). Dr. Powers explained that if he did not have the surgery, he would have progressive motor weakness of his left cervical trapezius and continued pain. (Tr. 230).

On December 30, 2004, Wallace underwent a left C3-4 extensive foraminotomy and microsurgical removal of osteoma involving the left C3 pedicle and pars with decompression of the left C4 nerve root. (Tr. 226, 253-57).

On January 12, 2005, after the procedure, Wallace reported that he was doing well but still had some left shoulder tenderness. (Tr. 226). Dr. Powers told Wallace to increase his activity over time, to continue walking, and not to lift anything much over 15-20 pounds for the following four weeks. (Tr. 226-27). He also informed Wallace about exercises he could do to relieve the muscle spasms in his upper extremities and upper back. (Tr. 226-27). Dr. Powers recommended a follow-up visit and stated they would make a determination at that time about when Wallace should be back to driving a truck. (Tr. 227).

In February 2005, Dr. Powers noted that Wallace continued to have "quite a bit of left upper shoulder and neck discomfort", numbness over the top of the left shoulder and extending down to the deltoid region. (Tr. 224). Dr. Powers stated that Wallace had excellent shoulder strength, but he also had numbness, motor weakness, and restricted neck movement. (Tr. 224).

7

Wallace was suffering from paraspinal muscle spasm and trapezius discomfort related to the

decompression at C3-4 and his numbness was due to sensory disturbance from nerve root

decompression and probably from contusion of the nerve with the decompression. (Tr. 224). Dr.

Powers recommended therapy and he did not think Wallace was ready to return to work and

noted that he would re-evaluate him in four weeks to make a determination at that time. (Tr.

224-25).

On March 23, 2005, Dr. Powers saw Wallace for his third postoperative visit. (Tr. 222).

Wallace stated that he had been going to physical therapy for one month and it was "greatly

helping his symptoms" and his pain had greatly improved. (Tr. 222). He still complained of pain

in the posterior neck and numbness around the incisions, left shoulder and trapezius aching and

aching in the left upper arm, and tingling and numbness in the left arm and hand. (Tr. 222). Dr.

Powers stated that Wallace should continue his last two weeks of physical therapy and may

return to work on April 11, 2005. (Tr. 223).

Wallace underwent an MRI of the cervical spine on October 4, 2005. Dr. Powers noted

that there were no significant changes from Wallace's previous, preoperative studies from

October 2004. (Tr. 220, 406). The MRI revealed mild disc degenerative changes at the C3-4

level with hypertrophic degenerative changes of the left C3-4 facet joint, contributing to left C3-4

neural foraminal narrowing; small central protrusion of the C4-5 disc; mild posterior bulge of the

C6-7 disc; and no evidence of cervical spinal cord compression or edema. (Tr. 220, 406).

On October 24, 2005, Wallace told Dr. Powers that he was at work lifting heavy boxes

and got a sharp stabbing pain that shot down into the back of his neck and up the back of his

head. (Tr. 220). At work, Wallace lifted boxes weighing about 170 pounds, and he loaded

8

between 13 and 14 boxes on each skid. (Tr. 221). Dr. Powers believed that this was "pushing the limits" due to Wallace's age and the weakness in his left trapezius muscle. (Tr. 221). Dr. Powers stated that Wallace is "at a point now where he is unable to carry out the type of heavy labor that he has been performing for the last 20+ years" and that he should consider a job change. (Tr. 221). Dr. Powers advised that Wallace stop working until his pain subsided. (Tr. 221). He prescribed physical therapy three times a week for six weeks. (Tr. 221).

On December 7, 2005, Wallace returned to see Dr. Powers due to increased and continued pain despite finishing physical therapy. (Tr. 218). Wallace stated that he was experiencing spasms in the left shoulder and left side of the neck and into the left scapula. (Tr. 218). Dr. Powers stated that Wallace has a chronic pain problem around the left shoulder and he referred him to a pain management specialist. (Tr. 218).

Wallace treated with William A. Rolle, Jr., M.D., on January 17, 2006 for a physiatric evaluation and treatment of his cervical and left upper extremity pain. (Tr. 242-43). Dr. Rolle's impression was cervical pain with left upper extremity radicular symptoms. (Tr. 243). He ordered an MRI of Wallace's cervical spine and an EMG of the left upper extremity. (Tr. 243). Dr. Rolle prescribed Lyrica and recommended a follow-up visit. (Tr. 243).

On January 18, 2006, Wallace underwent an MRI of the cervical spine which revealed degenerative changes of the cervical spine resulting in mild canal and neural foraminal encroachment. (Tr. 244-45). There was no evidence of abnormal postoperative enhancement and no evidence of an acute disc herniation. (Tr. 244).

Wallace returned to see Dr. Rolle on January 26, 2006. (Tr. 238-39). Dr. Rolle noted that the electrodiagnostic studies were abnormal, there was left median nerve entrapment at the

9

wrist without evidence of denervation, left ulnar compression neuropathy at the elbow without evidence of denervation affecting both motor and sensory fibers, and there was no evidence of left cervical radiculopathy. (Tr. 238-41).

In February 2006, Dr. Rolle noted that Wallace's symptoms had not improved and stated that he may require surgery. (Tr. 237). Dr. Rolle referred Wallace to a hand surgeon. (Tr. 237).

On February 21, 2006, Robert J. Maurer, M.D., examined Wallace and noted that he had increasing pain and numbness in the left arm. (Tr. 353). Dr. Maurer recommended carpal tunnel release and cubital tunnel release.[4] (Tr. 354).

On March 20, 2006, Dr. Maurer performed left carpal tunnel release, left cubital tunnel release, and ulnar neurolysis at the elbow without transposition. (Tr. 281-83, 351). One week after the surgery, Wallace reported that he was doing well but he still had numbness and tingling in his fingers, which may have been a little less. (Tr. 349-50). In April 2006, Wallace reported that he had little relief from the surgery. (Tr. 348). Dr. Maurer stated that Wallace should not lift more than two pounds with the left upper extremity. (Tr. 350).

On May 9, 2006, Wallace reported to Dr. Maurer that he was pleased with the results on his left side, but he had increasing pain with the right hand and right elbow. (Tr. 346-47). Dr. Maurer stated that surgery on the right side would be scheduled and that Wallace should remain off work, unless he could find light duty one-handed work. (Tr. 347). A nerve conduction study on May 9, 2006 revealed abnormal results for both motor and sensory function of the right median nerve at the level of the wrist and the right ulnar nerve at the level of the elbow indicating

---

[4] Carpal tunnel syndrome is a localized peripheral neuropathy that affects the hands. See http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/compression/carpaltunnel.shtml. (Last accessed March 14, 2014).

moderate to severe carpal tunnel and cubital tunnel syndrome. (Tr. 516).

On May 15, 2006, Dr. Maurer performed right carpal tunnel release, right cubital tunnel release with anterior submuscular transposition, and right ulnar nerve block at the elbow. (Tr. 296-98, 345). After the surgery, Wallace reported that he was doing well but he did not notice any resolution of the numbness and tingling in his fingers, but things were not worse than they were before the procedure. (Tr. 343). Dr. Maurer advised Wallace not to lift more than two pounds on the right side, and he should not do any repetitive pushing, pulling or lifting. (Tr. 343).

On May 30, 2006, Wallace reported that his preoperative paresthesias had all but resolved except for the base of his long finger, which was improving a little each day. (Tr. 342).

On July 11, 2006, Wallace told Dr. Maurer that he had substantial improvement since his surgery, but he gets pain in his right hand if he overuses it. (Tr. 341). Dr. Maurer stated that Wallace could return to work and he released him to full, unrestricted work as of July 15, 2006. (Tr. 341).

In October 2006, Wallace reported pain and numbness in both hands and wrists with swelling. (Tr. 339). Dr. Maurer advised that recovery from the ulnar nerve surgery could take a year or more. (Tr. 339-40). He recommended that Wallace continue to use the bilateral wrist supports, take an anti-inflammatory, and follow-up with a rheumatologist. (Tr. 340).

On November 28, 2006, Wallace treated with Robert G. Sanford, M.D., for evaluation of possible arthritis of the wrists. (Tr. 246-48). Dr. Sanford's impressions were history of carpal tunnel syndrome and recent carpal tunnel syndrome release procedures; history of tardy ulnar nerve syndrome with release procedures; peripheral neuropathy, probably related to diabetes of

11

the hands and feet; and possible mild early degenerative disease of the wrist. (Tr. 247). Dr. Sanford recommended additional lab tests, Tylenol Extra Strength, he prescribed a different nonsteroidal anti-inflammatory, recommended continued physical therapy, and a follow-up visit. (Tr. 248).

In July 2007, Wallace reported to Dr. Montisano that he was feeling better, exercising more and walking more. (Tr. 402). Wallace stated that he recently went to Egypt, Israel and Jordan and did a lot of walking and felt much better. (Tr. 402). Dr. Montisano prescribed Lyrica. (Tr. 402).

In November 2007, Wallace fell down stairs and rolled his ankle. (Tr. 399). Dr. Montisano examined Wallace, prescribed Vicodin and referred him to orthopedics. (Tr. 399). On November 2, 2007, Wallace treated with Timothy S. Ackerman, D.O., for an orthopedic consultation. (Tr. 275-76). Dr. Ackerman placed him in a Cam walker and told him not to place any weight on that ankle for a few days. (Tr. 275). Three weeks later, Wallace reported to Dr. Ackerman that his ankle was not any better. (Tr. 273). Therefore, Dr. Ackerman placed him in a cast for three weeks. (Tr. 273). In December 2007, Wallace had the cast taken off and stated that his ankle was feeling better. (Tr. 271-72).

On March 7, 2008, Wallace returned to see Dr. Ackerman with complaints of problems with his bilateral upper extremities. (Tr. 269-70). Dr. Ackerman ordered EMGs of the bilateral upper extremities including the cervical nerve roots. (Tr. 269). On March 27, 2008, Dr. Ackerman noted that the EMG showed bilateral upper extremity carpal tunnel syndrome and electrodiagnostic evidence of bilateral ulnar neuropathy at the elbows with the left greater than the right. (Tr. 267).

On March 19, 2008, Wallace treated with Steven E. Morganstein, D.O., with complaints of wrist, hand and elbow pain. (Tr. 264-65). Wallace underwent electrodiagnostic testing of the bilateral upper extremities. (Tr. 264-65, 519-23). Dr. Morganstein noted that the EMG was abnormal, there was evidence of bilateral carpal tunnel syndrome, evidence of bilateral ulnar neuropathy at the elbows (left greater than the right), and no evidence of cervical radiculopathy. (Tr. 265, 519-23).

In April 2008, Wallace reported that he had some improvement after his left cubital tunnel release, but he stated that he has less pain on the right than on the left and the symptoms on the left had been increasing. (Tr. 337). Dr. Maurer recommended continued observation, splinting, anti-inflammatory medication, or a steroid injection. (Tr. 338). Wallace stated that he wanted to proceed with revision surgery, even though Dr. Maurer advised that his symptoms may not be any better and could be worse by revision surgery. (Tr. 338).

On May 12, 2008, Dr. Maurer performed revision left ulnar nerve neurolysis at the elbow with anterior submuscular transposition, and an ulnar nerve block was administered at the elbow after the surgery for pain relief. (Tr. 315-17, 336). One week after the surgery, there was no improvement. (Tr. 335). Wallace continued to complain of numbness in the left arm and pain at the left elbow at the incision site, worse than before the surgery. (Tr. 335). On May 28, 2008, there was no significant new pain, but no significant improvement. (Tr. 334). Wallace stated that because he is a truck driver and has to load and unload, he was not ready to return to work. (Tr. 334). Dr. Maurer stated that was up to him, and if there was light duty, non-loading work with only driving, he may be capable of doing that work in the following month or so. (Tr. 334).

In June 2008, Wallace reported to Dr. Maurer that he had no new significant pain, though

13

he still had numbness at the elbow and forearm and did not notice any improvement from before the surgery. (Tr. 333). Dr. Maurer advised that Wallace could resume activities as tolerated. (Tr. 333).

Around June and August 2008, Wallace reported to Dr. Montisano that he still experienced numbness and tingling in his hands, he had not been exercising because of pain in his arm, he had pain in his neck, and suffered from headaches. (Tr. 392-93).

On August 13, 2008, Wallace underwent an x-ray of the cervical spine which revealed straightening of the cervical spine with mild diffuse disc space narrowing, no fracture or subluxation and alignment did not change with movement, though movement was somewhat limited. (Tr. 405).

On September 3, 2008, Wallace treated with Walter C. Peppelman, Jr., D.O., for evaluation of his chronic neck pain. (Tr. 366-67). After examination and review of Wallace's x-rays, Dr. Peppelman stated that he was unsure of the anatomic cause of Wallace's subjective complaints and chronic neck pain. (Tr. 367). He noted that Wallace's x-rays revealed normal axial and sagittal alignment. (Tr. 367). Dr. Peppelman ordered a new MRI of the cervical spine. (Tr. 367).

On September 10, 2008, Wallace reported to Dr. Montisano that he continued to have neck pain and headaches, and pain radiating down his shoulder into the left elbow. (Tr. 390).

An MRI of the cervical spine on September 15, 2008, revealed left-sided C3-4 foraminal narrowing, small central to right paracentral C4-5 disc protrusion not significantly changed since the prior exam on January 18, 2008. (Tr. 581).

Wallace treated with James P. Argires, M.D., on September 17, 2008 for his neck pain.

14

(Tr. 419-20). Dr. Argires noted that Wallace had a hypertropic ridge with some intervertebral foraminal encroachment at C3/4 on the left, which caused his neck and arm pain. (Tr. 420). Dr. Argires recommended epidurals, noting that he had enough surgery. (Tr. 420).

On October 1, 2008, Wallace treated with Sharma Saloni, M.D., and Jill M. Eckert, D.O., for treatment of his neck, arm and elbow pain. (Tr. 373-76). The doctors recommended a cervical epidural steroid injection, prescribed a pain cream, advised that he continue taking Vicodin, and gave him a prescription for an MRI of the L-spine. (Tr. 375). That MRI revealed degenerative changes and L5-S1 small broad-based central disc protrusion, slightly eccentric to the left. (Tr. 580).

In December 2008, Wallace returned to see Dr. Eckert and Jennifer K. Brackeen, D.O., and reported that he still had no resolution of his neck pain and frequently experienced shooting pains down his left neck to his left elbow. (Tr. 370). Wallace also complained of occipital headaches. (Tr. 370). The doctors recommended that Wallace take medications, they noted that Wallace was not interested in a cervical epidural, and discussed a possible trigger point injection for his headaches. (Tr. 371).

On January 23, 2009, Dr. Argires stated that Wallace still suffered from pain and the posterior decompressive hemilaminectomy had offered him minimal relief. (Tr. 429).

Wallace underwent an MRI of the cervical spine on January 29, 2009. (Tr. 459). The MRI revealed posterior disc bulging and osseous ridging most severe and C4-5 and C6-7; no overt osseous central canal narrowing or neural foraminal narrowing; and mild focal effacement of anterior thecal sac at C4-5. (Tr. 459).

On February 10, 2009, Dr. Argires noted that Wallace had considerable restriction in

15

internal and external rotation of the right shoulder. (Tr. 437). Dr. Argires believed that he might

have a partial tear of the supraspinatus. (Tr. 437). He recommended another MRI before

considering any cervical surgery. (Tr. 437). Wallace had an MRI of the right shoulder which

revealed a rotator cuff tear with degenerative changes in the acromioclavicular joint, and some

mild effusion. (Tr. 445, 457-58).

Wallace regularly treated with Denise F. Montisano, M.D. (Tr. 377-416). In February

2009, Wallace reported to Dr. Montisano that he had a lot of pain on the right side and the

constant pain has kept him from exercising. (Tr. 386). Wallace believed that things were "as

bad as they were when he had his first surgery." (Tr. 386).

On March 3, 2009, Wallace treated with Thomas R. Westphal, M.D., for his right

shoulder pain. (Tr. 448-49). Upon examination of the right shoulder, Dr. Westphal noted that

Wallace had markedly restricted range of motion. (Tr. 448). Dr. Westphal's assessment was

chronic impingement of the right shoulder, torn right rotator cuff, and torn labrum. (Tr. 449).

Dr. Westphal scheduled surgery. (Tr. 448-49).

On March 9, 2009, Wallace had an x-ray of the right shoulder. (Tr. 455). Dr. Westphal

interpreted the x-ray and stated that he had a normal right shoulder. (Tr. 456).

Dr. Westphal performed right shoulder surgery on March 25, 2009. (Tr. 467-68). After

the surgery, Wallace was discharged home and instructed to followup with his physicians. (Tr.

462-63). He attended physical therapy after the surgery. (Tr. 525-38). He completed a form at

physical therapy and indicated that medication gave him no relief, he needed someone to care for

him at all times, he could not sleep at all, he could not lift anything at all, he did not go out very

often due to his problem, he could not travel at all except for appointments, he could not sit more

than thirty (30) minutes, and he could not do any work at all. (Tr. 530).

An x-ray of the right shoulder on April 1, 2009 showed evidence of subacromial decompression and the presence of anchors in the humeral head. (Tr. 490-91).

In April 2009, Wallace had a follow-up visit at Dr. Westphal's office. (Tr. 490). It was noted that Wallace was doing well, his pain was controlled and he started physical therapy. (Tr. 490).

Wallace was examined by Dr. Westphal on May 4, 2009. (Tr. 487). Wallace reported increased pain with swelling. (Tr. 487). Dr. Westphal noted that Wallace had satisfactory range of motion, no instability, and he still had weakness. (Tr. 487). Dr. Westphal recommended physical therapy and advised Wallace to be patient because recovery could take several months. (Tr. 487).

On May 20, 2009, Jessica A. Ward, D.O., performed a Disability Determination Examination. (Tr. 473-78). Dr. Ward diagnosed polyneuropathy, status post rotator cuff repair, chronic headaches, diabetes mellitus that is uncontrolled, hypertension and hyperlipidemia. (Tr. 476). Dr. Ward completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities. (Tr. 477-). Dr. Ward determined that Wallace is capable of occasionally lifting and carrying two - three pounds; standing and walking four hours in an eight-hour day; he had no limits with sitting; could push and pull unlimitedly; could occasionally bend, kneel, stoop, and crouch; could never balance or climb; and he was limited with reaching, handling, fingering and feeling. (Tr. 477-78).

On May 27, 2009, Dr. Westphal examined Wallace's right shoulder after the rotator cuff surgery. (Tr. 486). Dr. Westphal noted that Wallace continued to improve but was "not nearly

17

recovered." (Tr. 486). He recommended that Wallace continue therapy to work on active range of motion and they will gradually introduce progressive resistive exercise.

On June 2, 2009, a Physical Residual Functional Capacity Form was completed by Jennifer Hess. (Tr. 498-504). Wallace was diagnosed with diabetes, degenerative disc disease, and status post rotator cuff repair. (Tr. 498). It was determined that Wallace could occasionally lift and/ or carry twenty pounds; frequently lift and/ or carry ten pounds; stand and/ or walk for about six hours in an eight hour workday; was limited with pushing and/ or pulling in the upper extremities; he could occasionally climb, balance, stoop, kneel, crouch and crawl; and, he was limited in reaching with the right shoulder. (Tr. 499).

Wallace returned to see Dr. Westphal on September 21, 2009 for a reevaluation of his right shoulder. (Tr. 540-41). Upon examination, Dr. Westphal noted that Wallace had near full range of motion of the right shoulder, though he was not completely rehabilitated. (Tr. 540). Dr. Westphal recommended that Wallace restart exercising at home and recommended physical therapy, which Wallace declined due to the cost. (Tr. 540). He again advised Wallace to be patient with the recovery as it could take another six months to fully recover. (Tr. 540). An x-ray of the right shoulder on September 21, 2009 revealed a normal postoperative x-ray following subacromial decompression and rotator cuff repair. (Tr. 542).

An October 2009, MRI of the brain revealed two white matter hyperintensities within the right cerebral hemisphere. (Tr. 579).

On October 30, 2009, Wallace had an EMG and nerve conduction study due to his left leg numbness. (Tr. 578). The study of the left leg was normal. (Tr. 578).

In November 2009, Wallace was referred to neurologist Liana Laza, M.D., for evaluation

18

of leg numbness. (Tr. 547-48). Dr. Laza noted that Wallace had an abnormal cranial MRI showing two areas of abnormal signal in the right frontal area, which could cause his left leg symptoms. (Tr. 548). Dr. Laza scheduled Wallace for a spinal tap, which was non-contributory. (Tr. 546, 548, 562).

In December 2009, Dr. Laza noted that Wallace continued to complain of progressive weakness in the legs and arms, and numbness in the left leg. (Tr. 546). Dr. Laza recommended a cervical spine MRI. (Tr. 546). The MRI revealed mild spondylitic changes of the cervical spine, no evidence of high-grade central canal or neural foraminal narrowing at any level, and no appreciable interval change. (Tr. 576-77).

In March 2010, Dr. Laza stated that he reviewed the cervical spine MRI and the spinal cord looked normal. (Tr. 545). At this visit, Wallace complained of right leg dragging, and continued body aches and pains. (Tr. 545).

On March 12, 2010, Wallace underwent an MRI of the brain due to memory loss and right-sided numbness and weakness. (Tr. 575). The MRI revealed small nonspecific foci of abnormal white matter signal. (Tr. 575).

In May 2010, Wallace reported to Dr. Laza that he had an episode of bad spine pain from the neck down to the lower back, and he continued to have numbness in both hands and in the left leg. (Tr. 544). Dr. Laza noted that Wallace continued to have a lot of neurological symptoms and no clear diagnosis and his cranial MRI was unchanged. (Tr. 544).


**Discussion**

The ALJ proceeded through each step of the sequential evaluation process and

determined that Wallace was not disabled. (Tr. 11-17). At step one, the ALJ found that Wallace

had not engaged in substantial gainful work activity since October 23, 2005, the alleged onset

date. (Tr. 11).

At step two, the ALJ found that Wallace suffered from the severe impairments of cervical

disc disease, diabetes, neurological disorders and obesity.[5] (Tr. 11).

At step three of the sequential evaluation process, the ALJ found that Wallace did not

have an impairment or combination of impairments that met or medically equaled a listed

impairment. (Tr. 11).

At step four of the sequential evaluation process, the ALJ determined that Wallace is

unable to perform any of his past relevant work, but he has the residual functional capacity to

perform a range of light work, with no overhead reaching bilaterally; no balancing, crawling, or

climbing ropes, ladders or scaffolds; he can occasionally climb stairs; he can occasionally stoop,

bend and crouch; he can occasionally tolerate exposure to extreme cold, wet, water and liquids;

he must avoid working in loud or very loud environments; he should never work around

vibrating objects or surfaces, in high exposed places, around fast moving machinery on the

ground, around or with sharp objects, or around or with toxic or caustic chemicals. (Tr. 12-16).

At step five, the ALJ determined that there are a significant number of jobs in the national

economy that Wallace can perform. (Tr. 16). Wallace was therefore found to be not disabled

---

[5]An impairment is "severe" if it significantly limits an individual's ability to perform
basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes
necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing,
speaking, and remembering. Id. An impairment or combination of impairments is "not severe"
when medical and other evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's ability to work.
20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

under the Act from October 23, 2005, through the date of the ALJ's decision. (Tr. 17).

In his appeal brief, Wallace argues that the ALJ erred by finding that he does not meet Listings 1.04 and 11.14, and erred in determining that he can perform light work. (Doc. 8). Upon review, this Court finds merit in Wallace's arguments.

To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, Wallace bears the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990).

Wallace argues that he meets Listing 1.04A, Disorders of the Spine. To satisfy Listing 1.04A, Wallace had the burden of proving that he had a disorder of the spine, (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and, if there is involvement of the lower back, with positive straight-leg raising tests in the sitting and supine position. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (2013).[6] Wallace argues that the evidence reveals that he suffers from spinal

---

[6] Listing 1.04A provides, in part, as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

stenosis and osteoarthritis in the form of cervical spondylosis. (Doc. 8, pgs. 5-6).

Upon review, this Court finds that the evidence reveals that Wallace has met the requirements of Listing 1.04A. The evidence reveals that Wallace has disorders of the spine, spinal stenosis and osteoarthritis in the form of cervical spondylosis. There is evidence of a compromised nerve root and evidence of nerve root compression characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; and motor loss (muscle weakness) accompanied by sensory or reflex loss.

Wallace continually complained of pain in his neck and numbness, left shoulder and trapezius aching and aching in the left upper arm, and tingling and numbness in the left arm and hand. (Tr. 222, 243, 334, 343, 346-47, 349-50, 353-54, 376-76, 390, 392-93, 420, 437, 448-49, 486, 530, 544-46).

Several treatment notes from Dr. Powers reveal that Wallace suffered from motor weakness, restricted neck movement, paraspinal muscle spasm and trapezius discomfort related to the decompression at C3-4, and numbness due to sensory disturbance from nerve root decompression and probably from contusion of the nerve with the decompression. (Tr. 224). Wallace underwent cervical spine surgery for decompression of the left C4 nerve root. (Tr. 13, 234). Dr. Powers noted that Wallace had "a progressively worsening problem of left neck pain extending into the left shoulder area" and "minor weakness involving the left trapezius muscle and a left C4 sensory loss to testing." (Tr. 255).

---

reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1.

Other treatment notes, reviewed above, indicate that Wallace has weakness in his upper extremities and legs, left arm neuritis, difficulty with his hands and fingers, limitation of the motion in his spine, and restricted range of motion of the neck. Additionally, Wallace underwent several MRIs that revealed abnormal results. (Tr. 576-77).

Despite this evidence, the ALJ determined that Wallace failed to meet the requirements of Listings 1.02B, 1.04, 11.04 and 11.14. (Tr. 11). The ALJ reviewed the medical evidence and found that Wallace suffered from the severe impairment of cervical disc disease but he did not meet the Listing requirements. (Tr. 11-16). The ALJ stated that the evidence fails to establish an inability to perform fine and gross movements effectively, an inability to ambulate effectively, nerve root compression, atrophy, disorganization of motor function, or significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. (Tr. 11). The ALJ noted that Wallace has a history of neck and left shoulder pain. (Tr. 12-17). The ALJ noted that although Wallace does not have a definitive diagnosis for his neurological symptoms, they can be associated with diabetes, cervical problems and/ or his upper extremity nerve problems. (Tr. 16). The ALJ stated that although there was evidence of nerve compression before Wallace's neck surgery, this was prior to the alleged onset date. (Tr. 16). The ALJ also stated that there is no evidence of recurrent compression on postoperative studies, Wallace did not have epidural injections for his neck pain as recommended, there is no evidence that his headaches are so severe that they would preclude him from working, and there is no evidence of significant motor loss or an inability to perform fine and gross movements effectively. (Tr. 16). The ALJ also noted that Wallace is able to take care of his own personal needs, he testified that he is able to lift about fifty pounds,

23

though he has difficulty with overhead reaching, there is no evidence of gait disturbance, instability or imbalance, and there is no evidence that he uses a cane. (Tr. 16). The ALJ also noted that Wallace testified that he traveled abroad on a missionary trip but did minimal walking, usually walking only from the bus into a church. (Tr. 16). The ALJ stated that the sitting and walking that Wallace did while traveling and flying indicates that he is not as limited as he alleges. (Tr. 16). The ALJ also noted that Wallace reported to Dr. Montisano that he was looking for work. Further, the ALJ stated that neurological tests did not reveal any serious pathology that would preclude him from sitting, standing or walking with normal breaks. (Tr. 16).

The ALJ afforded little weight to the opinion of the DDS physician, Dr. Ward, who determined that Wallace was limited to sedentary work with no lifting/ carrying more than two to three pounds, and no standing/ walking more than four hours. (Tr. 16-17). The ALJ determined that the evidence does not support the limitations set by Dr. Ward and that his opinion was based on Wallace's subjective complaints, not the entire record. (Tr. 16-17).

Although the ALJ reviewed the medical evidence, this Court finds that substantial evidence does not support her decision that Wallace does not meet the Listing requirements.

Wallace also argues that he meets Listing 11.14, Peripheral neuropathies. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.14 (2013).[7] The ALJ determined that Wallace suffers from peripheral

---

[7] Listing 11.14 provides, in part, as follows:

Peripheral neuropathies. With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.

Listing 11.04B states:

neuropathy, but that there is no significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. (Tr. 13-14).

As stated, Dr. Ward diagnosed polyneuropathy and noted that Wallace had multiple complaints of neuropathic pain in his arms and legs and that many tests and treatments did not provide relief. (Tr. 473-78). Dr. Ward found that Wallace is capable of only occasionally lifting and carrying two to three pounds, he is limited in standing and walking, could never balance or climb, and he is limited with reaching, handling, fingering and feeling. (Tr. 477-78).

Wallace regularly complained of neuropathy symptoms.[8] The evidence also reveals that Wallace has significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. On several occasions, Wallace complained of tingling and numbness in his arms, legs and shoulder, problems with his hands and fingers, and trouble walking and sitting. (Tr. 24, 36-37, 48-50). He was prescribed Lyrica to treat his nerve and muscle pain. Wallace testified that he has trouble walking, he has to drag his legs at times, his legs gave out and he fell and broke his ankle, and he cannot sit or stand very long. (Tr. 48-50). Wallace testified that when he went on a service trip

---

> Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 11.14, 11.04B.

[8] Peripheral neuropathy symptoms vary, depending on which types of nerves are affected. Signs and symptoms may include: "[g]radual onset of numbness and tingling in your feet or hands, which may spread upward into your legs and arms." See http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/symptoms/con-200 19948. (Last accessed March 17, 2014).

in 2007 to Egypt, Israel and Jordan, he was not able to walk far, usually only from the bus into a church. (Tr. 16, 42-43). He stated that he could not go on a lot of the tours because there was too much walking. (Tr. 42-43).

Regarding his hands, Wallace underwent left carpal tunnel release, left cubital tunnel release, and ulnar neurolysis at the elbow without transposition. (Tr. 281-83, 351). He also underwent right cubital tunnel release with anterior submuscular transposition, and right ulnar nerve block at the elbow. (Tr. 296-98, 345). Substantial evidence in the record indicates that Wallace meets the requirements of Listing 11.14.

Lastly, Wallace argues that the ALJ erred in concluding that he is capable of performing light duty work. (Doc. 8, pgs. 9-13). However, because the Court finds that Wallace meets the Listing requirements, this argument will not be addressed. See 20 C.F.R. 404.1520(a)(4)(iii) ("At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled."). See also Hernandez v. Commissioner of Social Security, 198 Fed. Appx. 230, 232 (3d Cir. 2006) ("In step three, the Commissioner evaluates whether the evidence establishes that the claimant suffers from a listed impairment. If so, the claimant is automatically eligible for benefits.").

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. The district court can award benefits only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits. Gilliland v. Heckler, 786 F.2d 178 (3d Cir. 1986); Tennant v. Schweiker, 682 F.2d 707, 710

(8th Cir. 1982).  When faced with such cases, it is unreasonable for the court to give the administrative law judge another opportunity to consider new evidence concerning the disability because the administrative proceeding would only result in further delay in the receipt of benefits.  See Livingston v. Cailfano, 614 F.2d 342, 345 (3d Cir. 1980).  The decision whether to reverse or remand lies within the discretion of the court.  See, e.g., Gilliland, 786 F.2d at 185; Rini v. Harris, 615 F.2d 625, 627 (5th Cir. 1980).

In the present case, the record is extensive and well developed.  The record is 581 pages in length and includes the medical records of several doctors who have examined Wallace.  Substantial evidence in the record indicates that Wallace meets Listings 1.04A and 11.14.  Under these circumstances, there is no reason to remand for further consideration of whether Wallace is disabled.

**Conclusion**

Substantial evidence in the record indicates that Wallace is disabled and entitled to receive benefits.  Therefore, the decision of the Commissioner will be reversed with the direction that benefits be awarded to Wallace, as the Court finds that substantial evidence does not support the decision that Plaintiff is not disabled under the Act.  An appropriate order follows.

Date: April 30, 2014

United States District Judge

27